Jacob **FERSHTMAN** et al., Plaintiffs-
Appellants,

v.

Herman J. **SCHECTMAN** et al.,
Defendants-Appellees.

No. 107, Docket 71–1572.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1971.

Decided Nov. 3, 1971.

**1358**

Samuel Kalmanash, New York City, for appellants.

William G. Mulligan, New York City (Mulligan & Jacobson, New York City, of counsel), for appellees, Schectman, et al.

P. B. Konrad Knake, New York City (David Hartfield, Jr., and White & Case, New York City, of counsel), for appellee, Arthur Young & Co.

Before FRIENDLY, Chief Judge, WATERMAN and SMITH, Circuit Judges.

FRIENDLY, Chief Judge:

This case represents another attempt to invoke the antifraud provisions of federal securities legislation and the SEC's Rule 10b–5 to confer federal jurisdiction in a situation to which the statutes and rule do not apply.

Plaintiffs-appellants are nine of forty-seven limited partners in Penn Associates (Penn) suing both individually and derivatively. Defendants are the general partners of Penn, Arthur Young & Company (Penn's accountants), and the 461—8th Avenue Corporation. Although the complaint is long and diffuse and contains many immaterial allegations, the nub of it is this:

The general partners formed Penn pursuant to a limited partnership agreement dated May 4, 1956, for the purchase of a lease, expiring November 30, 1971, and a partially amortized second mortgage on a parcel of real estate consisting of an office building at 461 Eighth Avenue, New York City, and an adjoining parking lot. The purchase was actually effected through the 461—8th Avenue Corporation, an entity wholly owned by the general partners. Penn loaned 461—8th Avenue its entire contributed capital, and took the second

mortgage as security. Of the $730,000 stated capital of Penn, $400,000 was contributed by the limited partners, and $330,000 by the general partners. The general partners did not contribute their own funds, but rather took a bank loan for their stated commitment, posting the mortgage as security. This arrangement was clearly authorized by paragraph 15 of the partnership agreement.

The contributions of the limited partners were to be repaid at the rates of 4% per annum for the first five years of the partnership, 6% for the sixth through ninth years, and 8% for the tenth through fifteenth years. The annual net profits were to be divided so that the limited partners would receive 12% on the existing balance of their capital contributions plus their *pro rata* share of 25% of all rentals in excess of $815,000 in any one year.

Paragraph 6 of the partnership agreement provided:

6. The partnership shall commence on the date of filing the Certificate of Limited Partnership in the Office of the County Clerk of New York County. The partnership shall terminate on the 30th day of November, 1971, unless sooner terminated by either:

(a) a sale of the leasehold on the office building; or

(b) repayment of the contributions of the Limited Partners in full, as is more particularly hereinafter set forth; or

(c) retirement, death or insanity of a General partner.

The cross-reference in subparagraph (b) was to paragraph 8, which read:

8. The contributions of the Limited Partners to the capital of the partnership may be returned to them in whole, or in part, at any time, in the sole discretion of the General Partners, provided that all repayments of capital shall be pro rata among all the Limited Partners, subject to the provisions of paragraph 14.

Paragraph 14 provided that if a collateral agreement between Penn and 461—8th Avenue Corporation should be cancelled by reason of the sale of the leasehold, the limited partners should be entitled to receive the balance of their capital contributions, interest at the rate of 12% per annum on these since the commencement of the current fiscal year or the most recent profits distribution, and a portion of the capital gain realized on such sale in the proportion that the capital contribution of each limited partner bore to the total capital of $730,000. Finally, paragraph 13(b) gave the general partners the right to modify the agreement between Penn and 461—8th Avenue Corporation so as to extend the lease beyond November 30, 1971, and explicitly provided that "Such renewal or extension shall not extend the life of the limited partnership past the time set for termination in paragraph 6 herein."

The venture proved highly successful. As of March 31, 1968, a date whose significance will later appear, a limited partner making an initial capital contribution of $10,001.00 would have been repaid $6600 and would have received (or be entitled to receive) $13,426.75 in profits on the diminishing capital balances, an average return of some 18% per annum.

The rift in the lute developed when the general partners, having previously caused 461—8th Avenue Corporation to obtain a 20-year extension of the lease from January 1, 1968,[1] sent the limited partners a notice, dated March 29, 1968, wherein the former "elected to return to the Limited Partners the balance of their capital contributions, and to terminate the Limited Partnership, effective March 31, 1968." Attached to the letter was a schedule, prepared by defendant Arthur Young & Company, showing the unreturned capital contributions and the undistributed profits to which each limited partner was entitled. The limited partners were requested to communicate with Penn's counsel to obtain the papers they would have to execute in order to obtain these balances. Most of the limited partners did this. Three of them, who are plaintiffs in another action in the District Court for the Southern District of New York wherein federal jurisdiction is predicated solely on allegations of diverse citizenship, and the nine who are plaintiffs in this action, did not.

The complaint here claimed that "the cause of action hereinafter alleged arises under Section Nos. 12(2) and 17(a) of the Securities Act of 1933 as amended and Section 10(b) of the Securities Exchange Act of 1934 as amended, and Rule 10b–5 * * * of the Securities and Exchange Commission promulgated thereunder; and Section 352–c of the General Business Laws of the State of New York [McKinney's Consol.Laws, c. 20]." [2]

The complaint, in addition to asking compensatory and punitive damages of $2,000,000 for the class of limited partners, a figure seemingly plucked from the atmosphere, appears to have as its main objective, a decree requiring continuation of the partnership. It alleges a wide variety of misrepresentations and non-disclosures in connection both with plaintiffs' purchase of the limited partnership interests [3] in 1956 and with their "forced sale" pursuant to the termination of the partnership in 1968. With respect to the former, it suffices to say that, with one exception

---

1. While plaintiffs frequently compare this to the conduct condemned in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928), the pellucid provision of paragraph 13 of the partnership agreement, cited above, makes the reference fall rather flat.

2. In view of our holding that the complaint did not state a claim under the federal securities laws, we need not consider the applicability of the New York statute. See T. B. Harms Co. v. Eliscu, 339 F.2d 823, 829 (2 Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965).

3. Defendants concede these to have been "securities" within the meaning of the 1933 and 1934 Acts.

hereafter discussed, none of the alleged misrepresentations and non-disclosures are shown either to have been material within this court's definition in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848–850 (2 Cir. 1968), cert. denied, Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), or to have caused any damage. With respect to the latter, if defendants were legally entitled to terminate the partnership on March 31, 1968, in their sole discretion, it would make no difference what they misrepresented or concealed, even if we assume in plaintiff's favor that this transaction constituted a sale. See Levine v. Seilon, Inc., 439 F.2d 328, 332 (2 Cir. 1971); Drachman v. Harvey, 453 F.2d 722, 732 (2 Cir. 1971), reh'g in banc granted, 2 Cir., September 21, 1971.

The one matter alleged in the complaint that may, or may not, give plaintiffs rights of some sort is this: In April, 1956, the limited partners were sent copies both of the partnership agreement, whose provisions with respect to termination have been quoted, and the certificate of Limited Partnership which was to be filed in the office of the county clerk. Paragraph 8 of the certificate read as follows:

> The contributions of the Limited Partners to the capital of the partnership may be returned to them in whole, or in part, at any time, in the sole discretion of the General Partners, provided that all repayments of capital shall be pro-rata among all the Limited Partners, and further provided that in the event of the sale of the leasehold on premises 461 Eighth Avenue, New York City, the balance of the contribution of each Limited-Partner shall be repaid in full.

This differed from the corresponding paragraphs of the partnership agreement in failing to make clear that in the event of the sale of the leasehold, the limited partners were also entitled to share *pro rata* in any capital gain. Kaine, who had taken the lead in recruiting some of the limited partners

and is a plaintiff in the other federal action, called defendant Sidney Schectman, one of the leaders of the general partners, in regard to the discrepancy and, allegedly, a clarification of what events could terminate the partnership. This call produced a letter from Schectman stating that "We have a clarification on the provisions of paragraph 8 in the Certificate of Limited Partnership as outlined by Mr. Russell Wilde our attorney." The letter continued, "With specific reference to your inquiry, I quote." The quote was as follows:

> "A question has arisen with respect to the provisions of paragraph 8 in the Certificate of Limited Partnership concerning the rights of the general partners to pay off the limited partners. The Certificate of Limited Partnership is filed in the County Clerk's Office and is to give notice to the public concerning the rights and obligations of the partnership. The rights, however, as set forth in that agreement are not controlling. The agreement that is controlling concerning the limited partnership is the partnership agreement itself. Paragraph 8 in that agreement provides that the general partners can only pay off the limited partners in the event that the leasehold of the office building is sold.
>
> It is our understanding that the provisions of the limited partnership agreement will be the controlling provisions and that you, as a limited partner, may disregard the provisions of the Certificate of Limited Partnership. The reason no change was made in the Certificate of Limited Partnership prior to its filing was that time was of the essence and it had to be filed and no changes could be made within the time permitted."

The last sentence of the first paragraph not only went beyond the discrepancy between the certificate of limited partnership and the partnership agreement but was manifestly wrong. Perhaps what the attorney meant was that if the leasehold were sold, the general partners

could not pay off the limited partners simply by returning their capital contributions and their stipulated share in profits to the date of sale. However, the language not only failed to convey this, but also misstated the conditions upon which the general partners could return the limited partners' contributions.

■■ Despite this we are unable to see how transmission of the attorney's view, even if we assume this came to plaintiffs' attention, gives rise to a claim under the securities laws. It may well be that, upon discovering the difference between the letter and the partnership agreement, plaintiffs would have been entitled to rescission under § 12(2) of the 1933 Act, but this is the last thing they now desire. In an ordinary tort action for damages they would encounter the obstacle of contributory negligence, at least if the attorney's misstatement was merely negligent as distinguished from being fraudulent, see ALI, Restatement of Torts 2d § 552–A, contrast § 545–A (Tent. Draft No. 10, 1964), and, while we need not decide the point, we would suppose that if an action lies for damages as a result of negligent misrepresentation under the securities laws, the same would be true. See Note, Civil Liability under Section 10B and Rule 10B–5, 74 Yale L.J. 658, 688–89 (1965). Beyond that plaintiffs have suffered no damage from making their investments; rather they have reaped large profits. What they are really seeking is reformation of the partnership agreement to conform to the attorney's characterization of it. But we have held very recently that even a buyer defrauded in violation of the securities laws "is entitled to recover only the excess of what he paid over the value of what he got, not * * * the difference between the value of what he got and what it was represented he would be getting. * * *" Levine v. Seilon, Inc., *supra*, 439 F.2d at 334. Plaintiffs' efforts to bring themselves within the rule applied by some courts in favor of defrauded sellers confront the obstacle that if the partnership agreement governed, there was no fraud in connection with what they term a forced sale. On the other hand, if the letter on which they rely had the effect of reforming the terms under which the partnership could be terminated, their refusal to sign papers evidencing the return of their capital and their share of the profits was proper, and they are not "forced sellers" in any sense. All that they have is a claim for reformation based on state law.[4]

The district court dismissed the complaint for failure to state a claim on which relief could be granted. We think the dismissal should have been for want of federal jurisdiction. With that modification, the order is affirmed.

---

4. In light of the foregoing discussion, we need not consider the defenses of the statute of limitations and the special arguments presented by defendant Arthur Young & Company.